UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIAMMA VARUGHESE,

                Plaintiff,                        Case Number 13-11286

v.                                                Honorable David M. Lawson

WILLIAM BEAUMONT HOSPITAL,

                Defendant.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mariamma Varughese, a clinical nurse who had worked at William Beaumont Hospital since 1987, was fired on November 28, 2011 for violating a hospital policy regulating the dispensation and administration of medication to a patient. She brought claims for discrimination and retaliation on the basis of age (she was 59 years old) and national origin (she is from India) under federal and Michigan law. The defendant has filed a motion for summary judgment, alleging that the undisputed facts show no discrimination or retaliation, and that the firing was justified by hospital policy. The Court heard oral argument on May 13, 2014, and now concludes that the plaintiff's termination was not due to retaliation or discrimination. The defendant is entitled to judgment as a matter of law, and the Court will grant the motion for summary judgment and dismiss the case.

I.

The incident that prompted the firing occurred on November 9, 2011. There is not much dispute over what happened. A patient who had been diagnosed with tuberculosis was in an isolation unit at William Beaumont Hospital in Troy, Michigan and had to be transported to another department for a diagnostic procedure. Varughese had some pills in her hand that the patient needed

to take before the procedure, but there were no masks immediately available for her to wear into the isolation unit.  Varughese instructed a "transporter," who apparently is not a doctor, nurse, or technician, to give the pills to the patient.  The transporter hesitated, and after Varughese insisted, the transporter administered the medication to the patient while Varughese watched on a monitor. The transporter was uncomfortable with what had occurred and reported the incident.

Beaumont Hospital viewed the report as a serious matter.  Under the Hospital's Policy & Procedure 180.1, the persons authorized to administer medication are limited to physicians, dentists, registered nurses, and licenced practical nurses.  The policy also permits nursing students and certain lab technicians to administer medication under supervision, and respiratory therapists to administer prescribed respiratory medications.  The policy does not mention patient transporters.  Hospital Policy 1803 further states that "[a] Physician on staff, or a Clinical Nurse (RN, GN, Endoscopy LPN or EC LPN) licensed by the State of Michigan and credentialed or employed at WBH-Troy or from an outside agency may administer medications."  Def.'s Mot. for Summ. J., Ex. 6.  The policy also allows student nurses, physician assistants, and respiratory therapists to administer certain specified types of drugs or to administer medications under supervision.  This policy also does not mention patient transporters.

Hospital Policy 1017 imposes a number of specific duties on all staff who administer medications and specifies that they must, among other things: (1) know the medication that is being administered; (2) verify that the medication selected is correct based on the doctor's order or prescription; (3) verify that the medication is stable and check the expiration date; (4) verify there are no contraindications; (5) verify that the medication is being administered at the proper time and dose, by the correct route, and to the correct patient; (6) address patient or family concerns and

-2-

educate the patient and family on possible adverse reactions, if administering a new medication; (7) discuss any unresolved concerns with the patient's doctor and other relevant staff involved with the patient's care; and (8) remain with the patient until the medication has been taken.  Def.'s Mot. for Summ. J., Ex. 7, Policy 1017.  The policy requires that the person administering the medication must verify the patient's identity using at least two patient identifiers.  The administering person also must record the medication administered in the electronic medication administration record, and must document any adverse reaction or medication error, should one occur.

On November 17, 2011, Varughese received her last performance evaluation before the termination, in which she was rated "Commendable" or "Fully Effective" in every category.  Def.'s Mot. for Summ. J., Ex. 9.  Her supervisor, Barbara Slavin, specifically praised Varughese for "provid[ing] optimal care" to patients, being a member of two professional nurse associations for Indian nurses, and acting as a mentor to student nurses in her work area.  Around 4:30 p.m. that same day, Slavin called Varughese into her office, told Varughese that she had received a complaint, and stated that Varughese should stay home the next day, and Slavin would call her on Monday, November 21, 2011.  Due to an intervening holiday, Slavin later told Varughese that they would not meet until November 28, 2011, and Varughese was to stay home in the meantime.

On November 28, 2011, Varughese met with Slavin and human resources representative Mary Beth Zook.  Varughese was told that she was terminated and was given a "Plan for Performance Improvement" which evidently was meant to be the formal written notice of the termination.  In the termination notice, the incident was documented as follows:

> On 11/6/2011 [apparently referring to the November 9th incident] at approximately 1700 a transporter was dispatched to Room [redacted] to transport patient to CT. The patient was in an isolation room and on a video monitor.  When arriving at the room Mariamma brought the patient meds and said, "The patient has to have these

-3-

pills before they go to CT. We are out of masks so I need you to give these pills to the patient. I will watch you on the video monitor to make sure you give them." The transporter questioned Mariamma as she didn't think it was appropriate for her to be doing this. Mariamma stated it was OK "because she would be watching her give them from the video monitor." The transporter administered the patient the medication. This incident was reported on 11/15/2011.

Plan for Performance Improvement dated Nov. 28, 2011 at 1. The notice stated that:

> Mariamma failed to administer medications in a manner consistent with the standards and expectations of Beaumont Health System. As stated in Policy #1803 - Personnel Authorized to Administer Medication, only a "Physician on staff, or a Clinical Nurse (RN, GN, or Endoscopy LPN) licensed by the State of Michigan and credentialed or employed at Beaumont Hospital may administer medications." In addition, she used her position as an RN to put another employee in an inappropriate position.

> Based on this instance of gross neglect of duty, Mariamma's employment is terminated effective November 28, 2011.

*Ibid.* The notice of termination was signed and dated by Varughese at the bottom.

After she was given the notice of her termination and signed it, Varughese discussed other termination procedures with Zook, including payment for Varughese's "Combined Time Off" (apparently accumulated vacation time, amounting to about 500 hours). Varughese testified that she and Zook discussed "potentially resigning instead of being terminated," but her understanding was that she was terminated as of the meeting on the 28th. Def.'s Mot. for Summ. J., Ex. 2, Varughese dep. 140-41. Varughese testified that Zook told her that she could request to resign in lieu of termination, but Zook would have to discuss the request with management, and it would need to be approved. *Id.* at 141-42. In response to Varughese's request to be allowed to resign, Zook emailed human resources senior manager Debra Guido-Allen on November 29, 2011 at 11:27 a.m. and asked if Varughese could be allowed to resign. Varughese dep. 146. At 11:54 a.m. the same day, Guido-Allen replied to Zook that "Nancy and I discussed this request at length and do not support resignation in lieu of termination." *Id.* at 147.

Varughese asserts that when she was told by Slavin and Zook that she was terminated, she responded: "This seems like discrimination. I didn't kill any patient. I didn't hurt anybody." Varughese dep. 142. Varughese contends that she thought it was unfair that she was terminated for a "first offense," but she admits that she was twice written up before for giving or almost giving the wrong medication to patients. *Id.* at 143. Varughese testified that she expressed to Slavin and Zook that the "discrimination" was due to her being the "senior employee there," and they responded only that the medication incident was a violation of hospital policy amounting to gross neglect, and that she was being terminated based on that incident.

On November 29, 2011, at 8:29 p.m., Varughese emailed Zook and requested "a copy of my personnel file along with a hand book of employee benefits." Def.'s Mot. for Summ. J., Ex. 18, Email dated Nov. 29, 2011. Varughese's email stated that "I would also appreciate more time to review all of these papers to get you an answer as to my resignation." *Ibid.* On November 30, 2011, at 11:55 a.m., Varughese emailed Zook and attached a copy of a letter of resignation, which she asked Zook to acknowledge receiving. Zook later told Varughese by phone later that same day that her request to resign in lieu of termination had been denied.

On December 2, 2011, Varughese submitted a grievance to the Hospital asserting that she believed her termination was a result of age and national origin discrimination, and that the decision to "revoke" her option to resign in lieu of being terminated was "in retaliation for seeking a copy of my personnel file and documents related to my employment." Def.'s Mot. for Summ. J., Ex. 20, Letter dated Dec. 2, 2011. The Hospital reviewed the grievance and subsequently produced a Grievance Reply Form stating the results of the review. In its grievance reply, the Hospital cited the Michigan Public Health Code, Mich. Comp. Laws § 333.16104, and in particular sections (1)(b)

and (1)(c), which state that before delegating any nursing duty, a nurse must "determine the qualifications of the delegatee," and "determine whether the delegatee has the necessary knowledge and skills for the acts, functions, or tasks to be carried out safely and completely." Def.'s Mot. for Summ. J., Ex. 21, Grievance Reply Form. The reply form stated that "Mariamma delegated a nursing function to a transporter who does not have the necessary knowledge and skills to administer medications safely and competently," and that "[t]he termination is upheld and based on the seriousness of the offense, per Beaumont policy, [Combined Time Off] will not be paid." *Ibid.*

When asked at her deposition what she did to verify the transporter's qualifications to administer medication, Varughese responded that "[a]nybody can give a couple [of] pills to a patient or anybody else," and "[t]o administer a few pills to a patient won't take too much task." Varughese dep. 71-72. The plaintiff admits that she did not ask any questions of the transporter to determine what her experience was in administering medication, had not previously observed the transporter administering medication, and other than having seen the transporter working on the floor on prior occasions, the plaintiff had not "formally met her." *Ibid.* The plaintiff asserts that she did not ask the transporter if she was comfortable giving medication, but she contends that the transporter did not object. *Ibid.*

Varughese admits that the Hospital's policies on administering medication were explained to her, she was familiar with them, and as recently as March 2010 she completed mandatory annual training that included a module on the Hospital's medication policy. She testified that under the policy one of the duties of the nurse is to stay with a patient for "a couple of minutes" after administering medication to monitor any adverse reaction. Varughese dep. 57. She also testified that to ensure patient safety the nurse must verbally confirm the patient's identity by asking their

-6-

name and date of birth, as well as by checking the name and date of birth from the medication order against those recorded on the patient's wrist band.  Varughese admits that giving the medication to a patient transporter to administer was a violation of the relevant hospital policies, but she contends that she should have been put on suspension or probation instead of terminated.

The Hospital's "Program for Performance Management" states that an employee may be terminated immediately without a performance improvement plan or any other warning, when "a serious violation of policy has occurred."  Def.'s Mot. for Summ. J., Ex. 22, Program for Performance Management 282.  The policy provides examples of incidents that may justify immediate termination, which include "Gross Neglect of Duty."  *Ibid.*

On March 22, 2013, Varughese filed her complaint raising claims for age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* (count I), and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.* (count II); retaliation contrary to the ADEA (count III), Title VII (count IV), and ELCRA (count V); and national origin discrimination under Title VII (count VI) and ELCRA (count VII).  The defendant moved for summary judgment on all counts.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

-7-

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts."  576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'"  *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]."  350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

-8-

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

## A. Title VII, ADEA, and Michigan claims

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits an employer from retaliating against an employee who has opposed an "unlawful employment practice." 42 U.S.C. § 2000e-3(a).

Similarly, the Age Discrimination in Employment Act "forbids an employer 'to discharge . . . or otherwise discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Pierson v.*

*Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (quoting 29 U.S.C. § 623(a)(1)). In addition, "[t]he ADEA prohibits employers from retaliating against an employee for opposing or reporting age discrimination." *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 288 (6th Cir. 2012) (citing 29 U.S.C. § 623(d)).

The Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101 *et seq.*, prohibits the same conduct. "Cases brought pursuant to the [Elliott–Larsen Civil Rights Act] are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

The plaintiff does not contend that there is direct evidence of either discrimination or retaliation. In the absence of direct evidence of discrimination or retaliation, Title VII claims are subject to the familiar burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007). If the plaintiff does so, "[t]he defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action." *Id.* If the defendant offers a legitimate motive, then "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* The plaintiff may establish pretext by showing that the employer's stated reason either (1) has no basis in fact, (2) was not the actual reason for the action, or (3) is insufficient to explain the employer's action. *White v. Baxter Healthcasr, Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

-10-

1.  Discrimination

To establish a *prima facie* case of discrimination under Title VII through circumstantial evidence, the plaintiff must show that: "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).  The plaintiff may establish a *prima facie* case under the ADEA by showing that she (1) was at least 40 years old at the time of the alleged discrimination, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone substantially younger. *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006).

The parties do not dispute that the record establishes the first three elements.  The Hospital argues that Varughese has failed to establish a *prima facie* case of discrimination, because she has not identified any similarly situated person who was not terminated as a result of a similar incident of gross neglect.  The Hospital also argues that even if Varughese has made out a *prima facie* case of discrimination, she has failed to negate the legitimate nondiscriminatory justification that the Hospital relied upon in terminating her, which was her gross neglect of duty in directing a patient transporter to administer medication.

Varughese points out that she "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) (citations and internal quotation marks omitted).  To be "similarly situated," employees generally must "have dealt with the same supervisor" and "have been subject to the same standards." *Mitchell v. Toledo Hosp.*, 964 F.2d 577,

-11-

583 (6th Cir. 1992). The Sixth Circuit has cautioned, however, that district courts "should not assume . . . that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Consequently, a plaintiff must show only "that the comparable employee is similar 'in all of the *relevant* aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich*, 154 F.3d at 352); *see also Geiger*, 579 F.3d at 622-23 (collecting cases). In a case involving allegedly discriminatory discipline, the plaintiff must "show only that he and his proposed comparators were similar in all relevant respects, and that he and his proposed comparators engaged in acts of comparable seriousness." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

Varughese admits that her conduct in giving medication to a patient transporter was a violation of the Hospital's medication handling policies, and she conceded as much in a phone call to her supervisor on November 25, 2011, before she was terminated. Although she contends that suspension or probation should have been imposed, Varughese admits that the incident comprised "gross neglect of duty," and she does not contest that under the Hospital's "Performance Management Program," that is sufficient to justify immediate termination. But she says that others like her, namely the transporter who actually administered the medication to the patient, have not been treated so harshly.

Varughese contends that the patient transporter was "similarly situated" because she was involved in the same incident. However, that argument ignores the other relevant ways in which the

plaintiff's and the transporter's situations were not at all similar. Unlike the plaintiff, the transporter did not have any duty under hospital policy or state law to ensure that medication was properly administered, and she had received no training to that end. Moreover, Varughese maintains that she "delegated" her duty to the transporter, and as the defendant points out, she therefore assumed a position of authority over the transporter with regard to administering the medication. The Hospital therefore reasonably regarded her as more responsible for the ensuing breach of policy that occurred.

The Sixth Circuit has held that the difference in duties and level of responsibility imposed by law or policy on two persons involved in the same incident of mishandling medication is relevant and distinguishing. *Ruth v. Children's Med. Ctr.*, No. 90-4069, 1991 WL 151158, at *7 (6th Cir. 1991). As the court explained, a greater level of responsibility and duty is sufficient to render the employees dissimilar, and to justify more severe discipline:

> Plaintiff's argument that nurses and pharmacists should bear equal responsibility for medication errors belies the responsibility specifically imposed on pharmacists by Ohio law. Plaintiff simply asserts that the nurses should be considered "similarly situated," without presenting any evidence that the relevant aspects of Ruth's employment were nearly identical to those of the nurses.

> Lois Fangman and Ruth were pharmacists; both committed medication errors. Ruth received a final warning for his April 1987 error, while Fangman was only counseled. However, Ruth's error differed in both type and severity of potential consequences, and the employer reasonably could consider Fangman's error less egregious than Ruth's error, which caused the administering of phenobarbital at ten times the prescribed dosage. Accordingly, plaintiff failed to establish that a female pharmacist subject to less discipline had committed an offense of the same magnitude as plaintiff's offense.

> With respect to plaintiff and Diane Gary, both the duties of their positions and the magnitude of their errors differentiate them. As the director of defendant's pharmacy, Gary's responsibilities were largely managerial, and she rarely worked in plaintiff's position as a staff pharmacist. Although the relevant aspects of her duties were more similar to Ruth's at the time she was covering the second shift, the fact that her normal responsibilities extended beyond the responsibilities of a staff pharmacist means that her employment situation was not "nearly identical" to Ruth's. Ruth's

-13-

failures to check the medication cart occurred regularly and concerned a regular, daily responsibility. Gary's error occurred once and concerned a responsibility that she was infrequently required to bear.  Further, plaintiff presents no evidence to dispute defendant's proof that plaintiff's errors were chronic and willful.  These factors render Ruth dissimilar from Gary in any sense that is relevant to this case.

*Ruth v. Children's Med. Ctr.*, No. 90-4069, 1991 WL 151158, at *7 (6th Cir. 1991).

Moreover, Varughese admits that she was counseled on two prior occasions for giving or almost giving the wrong medication to patients.  A more extensive disciplinary history is a sufficient distinction between a plaintiff and other nurses with a less extensive or nonexistent disciplinary record.  *Dismuke v. Centennial Healthcare Corp.*, No. 04-71302, 2005 WL 1802118, at *4 (E.D. Mich. July 28, 2005) (finding critical dissimilarity between the plaintiff, a certified nurse anaesthetist "who had been reprimanded and written up for several incidents involving his treatment of residents and behavior while at work," and two other employees who did not have "extensive disciplinary histories").  Here, Varughese has made no showing that the transporters were involved in any prior incidents involving mishandled medication, but she concedes that she was.

Varughese attempts to cast her action as a "delegation" of duties, but in fact it involves a neglect of and complete failure to perform certain essential tasks that she was obligated to perform under hospital policy, such as verifying the patient's identity both verbally and by comparing the identification on the patient wrist band with the medication order.  Although the patient transporter may have improperly accepted the task of passing medication, which she was not authorized to perform, Varughese has not pointed to any such crucial duties that were imposed on the transporter under hospital policy and which she failed to uphold, such as verifying patient identity, or closely monitoring the patient for any adverse reactions, so that they could be dealt with and recorded in the Hospital's electronic records system.

-14-

Varughese contends that another Caucasian nurse was allowed to resign in lieu of termination after a "gross neglect of duty." But she does not dispute the defendant's account of that termination, in which it was determined that the nurse had a reasonable misunderstanding of the person to whom she was supposed to communicate her request to take time off, which resulted in her being absent from work without proper authorization. An incident involving a mistake in communications resulting in a nurse not showing up for a scheduled shift is qualitatively different than one in which a nurse neglects her duty to administer medication to a patient, and Varughese has failed to make any showing that the alleged comparator's offense was equally serious to hers, despite the fact that both were nominally classified as "gross neglect."

The plaintiff has not established a *prima facie* case of discrimination under Title VII or Michigan law.

## 2. Retaliation

Varughese premises her retaliation claim on the theory that she was given the option to resign in lieu of termination, and that option was withdrawn when she made a request for certain employment documents. In order to make a *prima facie* case of retaliation, the plaintiff must show that (1) she engaged in protected activity; (2) the defendant knew she exercised her rights; (3) the defendant took adverse employment action against the plaintiff; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 468-69 (6th Cir. 2012) (citing *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)); *see also Blizzard*, 698 F.3d at 288 (applying elements in ADEA case) (citing *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)).

-15-

The Hospital argues that Varughese has failed to make out a *prima facie* case of retaliation, because the request for copies of her personnel file and the employee handbook did not amount to protected activity, and Varughese did not engage in any other protected activity before her termination. The defendant also argues that it is undisputed that the decision not to allow Varughese to resign already had been made at the time she made her request for personnel records, so the Hospital's decision makers could not have been aware of the request at the time they made their decision.

The undisputed facts in the record do not support the plaintiff's arguments. Varughese appears to contend that she was offered the "option to resign" during the meeting on November 28, 2011, but this is belied by the fact that she admits that she was told in that meeting that she was terminated. Varughese concedes that her termination was effective when she was given the written notice of it, and she admits that she did not even suggest before the November 28, 2011 meeting that she had any complaint relating to alleged discrimination.

Because the decision to terminate her was made before that meeting, the Hospital could not have been aware at that time of any complaints that she made either at the meeting or later alleging age or national origin discrimination, and that decision could not have been caused by any such complaints. Varughese points to her Exhibit 20, which is a series of emails among the supervisors and human resource personnel dealing with the question whether Varughese would be allowed to resign in lieu of termination. It appears that Slavin and Zook favored that option, but that would have required a reversal of the termination decision, which had been made by November 27. Guido-Allen would not relent, and the option was never formally extended to the plaintiff. Varughese appears to argue that the subsequent "decision" by the employer not to change its decision and allow

-16-

resignation instead of termination was retaliatory.  But Varughese concedes that the employer already had decided to do the same thing — simply to terminate her — so the later, allegedly retaliatory decision that resulted in the same outcome is irrelevant to the charge of retaliation. Moreover, the request for copies of her personnel records and a copy of the employee manual is insufficient as a matter of law to constitute "protected activity," because nothing in Varughese's terse email requesting information expressed any sort of opposition to any incident of alleged unlawful activity. *Blizzard*, 698 F.3d at 288 (explaining that "[a] plaintiff asserting . . . a [retaliation] claim must prove that she took an overt stand against suspected illegal discriminatory action to establish that she engaged in a protected activity" (quotations and citations omitted)).

The plaintiff has not established a *prima facie* claim of retaliation under any of the state or federal statutes upon which she relies.

### B.  Pretext

Even if the plaintiff had advanced a *prima facie* showing on any of her claims, the defendant still is entitled to judgment as a matter of law because the plaintiff has failed adequately to rebut the Hospital's nondiscriminatory basis for the termination, and for denying the plaintiff's request to be allowed to resign in lieu of termination.  Varughese's brief contains a short recital of various alleged incidents in which she contends that her supervisor, Barbra Slavin, neglected or mistreated her because of either her age or her national origin.  The incidents apparently occurred at indeterminate times between when Slavin became Varughese's supervisor in 2007 and her termination on November 28, 2011.  Varughese does not appear seriously to press any claims based on these incidents, such as when Slavin would "ignore her" at work and instead ask other employees who

-17-

were standing nearby to report on events in the unit, or when Slavin allegedly removed Varughese from a nurse's committee and from "charge nurse" duty.

Varughese does not make any argument or reference any facts from the record to establish that any of those incidents or whatever consequences may have followed from them amounted to adverse actions, and she conceded in her deposition that she could not identify any other specific nurse that was treated more favorably than she was in similar circumstances. Moreover, Varughese testified that her evaluations by Slavin over the years generally were positive, she had a good relationship with Slavin, and she never raised any complaints of discrimination before November 28, 2011. None of these slights supports any suggestion that the medication incident was a pretext for a more insidious motive by Beaumont Hospital.

Moreover, Varughese agrees that mishandling medication was sufficient to comprise a "gross neglect of duty," and that gross neglect is sufficient to justify immediate termination. She offers nothing to suggest that the Hospital did not actually rely on the medication mishandling incident in deciding to terminate her. She also has not identified any language in the Hospital's policy that would require the employer to allow her to resign in lieu of termination for gross neglect of duty.

Instead, Varughese points solely to the alleged "inconsistency" between the "violation of policy" justification stated in the termination letter, and the "violation of law" justification cited in dismissing her grievance. Varughese contends that this "inconsistency" in the employer's justifications is sufficient to give rise to an inference that the alleged basis was false. But that argument neglects the fact that the plaintiff herself concedes that she improperly turned over the medication to the patient transporter, and that this conduct violated hospital policy. Regardless of

-18-

what other later "inconsistent" justification might have been advanced, Varughese already has admitted (and does not dispute now) that the original factual basis for the termination was true.

Moreover, the allegedly "inconsistent" justification in the grievance letter was based on the same facts that were recited in the notice of termination, and the citation to state law merely reinforced the earlier justification, rather than contradicting it or suggesting that it was inadequate. Varughese does not even contend that the later justification replaced the earlier; in fact she refers to it as an "expanded" justification. Varughese asserts that a later review of a complaint submitted to state authorities determined that no violation of state law could be sustained; but that determination is irrelevant because the plaintiff concedes that she violated the policy, and it is undisputed that the policy violation was sufficient to justify termination.

The cases that the plaintiff cites on this point are distinguishable because in each of them the employers advanced significantly different factual bases for the terminations at different stages, and it later was undisputed that part of the initially-stated justification was false, or that at least one of the factors advanced at some point in the proceedings was not relied upon. In *Eades v. Brookdale Senior Living, Inc.*, 401 F. App'x 8, 12-13 (6th Cir. 2010), the employer (1) first maintained that the plaintiff was terminated for refusing a severance package; (2) in reply to an EEOC charge stated that the termination was for performance reasons; (3) in a deposition by one of its officers admitted that the relevant decision makers never were aware of any performance problems, and maintained that the decision was made after learning that the plaintiff improperly retained a severance payment from a former employer, when he found new work; and (5) finally, on appeal, argued that the plaintiff's performance never was a factor in his termination, and contended that the company's senior legal counsel "erred" by including that basis in the EEOC response.

-19-

Likewise, in *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006), the employer initially stated five reasons to support the plaintiff's termination during a telephone call with the employee and decision makers, two of which were later omitted from the company's response to an EEOC charge and from the company's arguments in the district court and on appeal. The Sixth Circuit found that the two reasons that were omitted were factually untrue at the time they were first stated, and the fact that those false reasons were omitted from the later justifications could support an inference that the other stated reasons also were untrue or unfounded.

There is really no inconsistency in the Hospital's reasons for firing the plaintiff. One might believe that hospital personnel overreacted to the misconduct when selecting the severity of discipline to be imposed. But no reasonable factfinder could conclude that the assigned reason for termination — violation of the medication dispensing rules — was a pretext for age or national origin discrimination.

III.

The Court's review of the record convinces it that the plaintiff has not established material fact questions on any of her claims that require resolution by a jury. The defendant is entitled to a judgment in its favor as a matter of law on all counts of the complaint.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #17] is **GRANTED**.

-20-

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 8, 2014

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 8, 2014.

s/Shawntel Jackson
SHAWNTEL JACKSON